**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **LESTER HARRISON** | : | **No. 17-228** |

**MEMORANDUM**

**Schiller, J.**                                                                                                         **September 17, 2018**

      Lester Harrison is charged with possession with intent to distribute controlled substances, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a convicted felon, in violation of 21 U.S.C. §§ 841 (a)(1) and (b)(1)(C), 18 U.S.C. § 924(c)(1), and 18 U.S.C. § 922(g)(1). Harrison was stopped and searched after officers claimed to have smelled marijuana emanating from his car. Harrison moves to suppress physical evidence of drugs and firearms, as well as his inculpatory statement and text messages discovered on his phone, arguing that the stop and the search of him and his car violated the Fourth Amendment. The Court held a hearing on November 7, 2017, at which Philadelphia Police Department Officers Michael Schmidt and Edward Wright testified. Harrison later testified on January 16, 2018.

      Upon review of the motions and testimony, the Court does not believe the police officers' testimony regarding the smell of marijuana. Because there is no other independent basis to justify the seizure of Harrison and subsequent search of him and his car, the Court will grant the motion to suppress.

1

I. BACKGROUND

   A. Investigation and Stop of Harrison

On the afternoon of March 11, 2017, Police Officers Schmidt and Wright were patrolling the area near 2000 South Simpson Street in plainclothes and an unmarked car driven by Officer Schmidt. (Tr.[1] at 9–10.) Officer Schmidt joined the police in 2008 and has been assigned to the 12th District, which includes the block of 2000 South Simpson Street, since 2010. (*Id.* at 6–7.) Officer Wright joined the police in 2007 and has been assigned to the 12th District since then. (*Id.* at 63.) Both officers have experience making narcotics arrests and regularly encounter the smell of fresh marijuana in their work. (*Id.* at 8–9, 63–64.)

While driving down South Simpson Street, Officers Schmidt and Wright noticed a man crouch behind the passenger side of Harrison's parked car after looking toward the officers as they drove past. (*Id.* at 10, 65.) Although Officers Schmidt and Wright were in an unmarked car, they were often identified as police officers from their routine patrols. (*Id.* at 11–12.) The officers suspected that the man recognized them as police officers, and they decided to investigate. (*Id.* at 10–11, 65–66.)

Because South Simpson Street is a one-way road with one lane of traffic, Officer Schmidt circled around the block. (*Id.* at 66, 76.) As they returned to Harrison's parked car, the officers no longer saw the man crouching next to Harrison's car, but Officer Wright still got out to investigate. (*Id.* at 12–13.) Officer Schmidt then parked the unmarked police vehicle about two car lengths ahead of Harrison's idling car. (*Id.* at 82–83.)

As Officer Schmidt parked the car, Officer Wright approached the passenger side of Harrison's car, where Officer Wright previously observed the man crouching. (*Id.* at 66.)

---

[1] "Tr." refers to the transcript of the November 7, 2017 hearing. "Tr. II" refers to the transcript of the January 16, 2018 hearing, at which Harrison testified.

Harrison's car was parked legally and Officer Wright did not see any contraband under the car. (*Id.* at 80.) Officer Wright recognized the person sitting in the passenger seat, Fabian Hitchman, as someone he knew from his regular patrol of the neighborhood and also identified him as the man who had been crouching. (*Id.* at 66–67.) Harrison, whom Officer Wright did not know, was seated in the driver's seat.

Officer Wright testified that Hitchman voluntarily lowered the passenger side window as he walked up to the car and that Hitchman greeted him. (*Id.* at 67–68.) Although Officer Wright perceived that Hitchman was acting "normal" and "very calm," he noticed the "overwhelming smell of fresh marijuana like emitting from that vehicle just coming right at me." (*Id.* at 68.)

Officer Schmidt testified that when he walked up to the driver's side of the car shortly afterwards, Harrison also lowered his window. (*Id.* at 15.) Once Harrison lowered the window, Officer Schmidt claimed that he "could immediately smell the odor of fresh marijuana coming from inside the vehicle." (*Id.* at 15.) However, neither officer testified to questioning Harrison about the smell of marijuana or ever mentioning it to the other.

Both officers stated that Harrison was nervous. Officer Schmidt described Harrison, who asked why he was being stopped, as "very nervous" and "just not really talking to me, but talking at me." (*Id.* at 16.) Harrison also "stated a couple times that he had MS." (*Id.*) Officer Wright noticed Harrison moving his left hand toward his thigh and the driver's side door while looking at Officer Wright. (*Id.* at 69–70; 83–84.) Although Officer Schmidt was standing next to and speaking with Harrison, he did not observe this arm motion. (*Id.* at 48.)

In response to Harrison's movement and demeanor, Officer Wright signaled for Officer Schmidt to remove Harrison from the car immediately. (*Id.* at 69–70.) Officer Wright never told Harrison to keep his hands visible. (*Id.* at 69.) Instead, he gestured by pointing down over the top

of the car's roof, which Officer Schmidt understood to mean that his partner saw "the occupants doing something that [meant] we had to take them out for [an] officer safety reason." (*Id.* at 16.) Based on this signal and Officer Schmidt's own observation of Harrison's nervousness, he asked Harrison to step out of the car. (*Id.* at 17.)

Harrison's testimony regarding his initial encounter with the officers differed significantly from their account. According to Harrison, he rolled down the passenger side window only after Officer Wright knocked on the window and signaled for him to do so. (Tr. II at 9–10.) When asked about his identity, Harrison offered his license and registration. (*Id.* at 10–11.) Officer Wright then ordered him to turn off his car. (*Id.* at 11.) Harrison asked if he had done anything wrong. (*Id.*) Rather than explain himself, Officer Wright repeated his instruction to turn off the engine "in a louder voice." (*Id.*) At first, Harrison hesitated to comply and reached to close the passenger window and lock the doors, thus effectively ending his interaction with the police. (*See id.*) But on second thought, Harrison complied with the request. (*Id.*) Then, Officer Schmidt "snatched the door open" and began to pull Harrison out of the car. (*Id.* at 11–12.)

### B. Patdown of Harrison

Once Harrison was out of the car, Officer Schmidt frisked him, beginning at the top of his body. (Tr. at 18.) In Harrison's jacket pocket, he "could feel immediately multiple hard glass vials." (*Id.*) Based on his experience, he believed the objects to be narcotics packaging. (*Id.*) Officer Schmidt did not manipulate the objects and immediately reached his hand into Harrison's jacket pocket and pulled out a plastic bag with six glass vials. (*Id.* at 19, 41.) The vials contained a "reddish liquid," which Officer Schmidt suspected to be codeine. (*Id.* at 19.)

Officer Schmidt then reached back into Harrison's pocket and removed another vial of the reddish liquid, four vials of marijuana, and a bottle of 44 pills, later identified as Xanax. (*Id.* at 20–21.) Officer Schmidt then handcuffed Harrison and finished searching him. (*Id.* at 21.)

**C. Search of Harrison's Car**

As Harrison was being frisked, Officer Wright also patted down Hitchman. (*Id.* at 72.) He did not find any contraband on Hitchman, so he returned him to the car. (*Id.* at 72–73.) Officer Wright testified, however, that Harrison, who was now handcuffed next to his car, was looking back into the car near the area where he was previously moving his arm. (*Id.* at 71, 73.) He recalled, "He would look up at me and he would just focus back on that particular area." (*Id.* at 71.) Officer Wright testified that he thought this was unusual and indicative that there may be contraband in the car. (*Id.* at 71–72.) He immediately moved Hitchman's legs to better see the floor in front of the driver's seat. (*Id.* at 73.) Then, Officer Wright saw the handle of a revolver wrapped in rubber bands under the driver's seat, which he seized. (*Id.*)

The officers' testimony regarding Harrison's location at the time the gun was discovered differed. After placing Harrison under arrest, Officer Schmidt testified that he walked Harrison down the street to the unmarked police car. (*Id.* at 21.) Once Harrison was secured in the car, Officer Schmidt returned to Harrison's car. (*Id.*) At that point, Officer Wright asked Hitchman to get out of the vehicle again and Officer Wright discovered the revolver. (*Id.* at 21–22.) Harrison remained secured in the police car throughout this time.

After finding the revolver, the officers continued to search the car. They found a plastic bag with sealed vials of marijuana in the closed center console. (*Id.* at 23, 56, 61.) Inside the trunk, police found a handgun, an extended magazine, and more marijuana. (*Id.* at 23–24; Suppl. Mem. of Law in Supp. of Mot. to Dismiss [Def.'s First Suppl. Br.], Ex. B)

Several hours after his arrest, Harrison waived his *Miranda* rights, made an inculpatory statement, and consented to a search of his cellphone, which uncovered text messages related to drug sales. (Def.'s Mem. of Law in Supp. of Mot. to Suppress at 1 [Def.'s Br.].)

**D.    The Police Officers' Testimony in *Commonwealth v. Dill***

On July 11, 2018, Harrison filed a second supplemental memorandum informing the Court that a Philadelphia Common Pleas court did not credit the testimony of Officers Schmidt and Wright in a similar case. (Sec. Suppl. Mem. of Law in Supp. of Mot. to Dismiss [Def.'s Sec. Suppl. Br.]) In that case, Officers Schmidt and Wright stopped an individual in a legally parked car in the 12th District only nine days after Harrison's arrest based on their perception of a strong smell of fresh marijuana. *Commonwealth v. Dill*, CP-51-0002316-2017. The officers testified that they were able to detect the strong scent of fresh marijuana as they drove past a car parked with its window open—and were even able to pinpoint the car as the specific source of the smell. (*Dill* May 9, 2018 Order, Findings of Fact ¶ 2, 4; Def.'s Sec. Suppl. Br. Ex B.) Officer Schmidt testified that he noticed the smell of marijuana at least 30 feet before they reached the defendant's car. (*Dill* Order, Findings of Fact ¶ 4; Def.'s Sec. Suppl. Br. Ex. A, Apr. 12, 2018 Tr. at 59.) Officer Wright testified that the smell was "full blast" and "hit you right in the face" upon opening the car door. (Def.'s Sec. Suppl. Br. Ex. A, Apr. 12, 2018 Tr. at 11.) The officers stopped their car and engaged the defendant. After the officers had a brief tussle with the suspect and drew their weapons, Officer Schmidt patted him down, and like in the present case, felt multiple vials in his pocket. The officers ultimately found nearly 100 grams of marijuana in the defendant's car, all inside of sealed vials or heat-sealed containers, and several small vials in his pocket.

In order to verify the officers' testimony regarding the smell of marijuana, Court of Common Pleas Judge Deborah Cianfrani ordered the Commonwealth to produce the physical evidence. After ensuring the drug packaging was unaltered, Judge Cianfrani found that she could detect the smell of marijuana from three feet away but could not at approximately ten feet away. Based on the observation that the odor was "barely detectable," the judge did not credit the officers' testimony regarding the overwhelming smell of marijuana. She concluded, "Officer Wright and Officer Schmidt could not, and did not, detect the odor of marijuana emanating" from the defendant's car. (*Dill* May 9, 2018 Order; Def.'s Sec. Suppl. Br. Ex B.) As a result, she granted the defendant's motion to suppress. (*Id.*)

## II. STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. Const. amend. IV. In order to suppress evidence, the defendant must make an initial showing that his Fourth Amendment rights were violated. *United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1994). However, the Government ultimately bears the burden of showing that a warrantless search or seizure was reasonable. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

## III. DISCUSSION

In deciding a suppression motion, a court must first determine the moment the defendant was seized, and next whether that seizure was justified by the facts known to the police at that time. *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003).

### A. **Harrison was seized when Officer Wright ordered him to turn off his car.**

The Fourth Amendment permits police to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v.*

7

*Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "A seizure does not occur every time a police officer approaches someone to ask a few questions." *Johnson*, 332 F.3d at 205. Rather, an interaction becomes a seizure once a reasonable person would "no longer feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* (quoting *Flordia v. Bostick*, 501 U.S. 429, 436 (1991)). Examples of such circumstances include the presence of multiple police officers, their display of a weapon, or "the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Several courts of appeals have concluded that police blocking a defendant's car so that he is unable to drive away is a show of authority that may result in a seizure. *See, e.g.*, *United States v. Jones*, 562 F.3d 768, 771–72 (6th Cir. 2009) (finding seizure occurred when unmarked police cars parked within several feet of a car's front and rear bumpers); *United States v. Kerr*, 817 F.2d 1384, 1386–87 (9th Cir. 1987) (holding that defendant was seized when a police officer blocked a one-lane street as defendant was backing out); *United States v. Pavelski*, 789 F.2d 485, 488 (7th Cir. 1986) (finding seizure occurred when third police car parked fifteen to twenty feet from defendant's car so that he was surrounded on three sides by patrol cars and may not have been able to drive away). Similarly, the First Circuit described a police officer's direction to turn off a parked car's engine so that the defendant could not drive away, in addition to his "commanding tone and manner," as "a near-classic case of facts that might—depending on the trier's interpretation—support either" finding a seizure or not. *United States v. Espinoza*, 490 F.3d 41, 49 (1st Cir. 2007). Citing this case law, this Court has previously held that a defendant was not seized at the moment his car was hemmed in, but slightly later in the encounter, when the defendant complied with the police officer's instruction to turn off his engine. *See United States*

8

*v. Hicks*, Crim. A. No. 08-271, 2009 WL 3150394, at *4 (E.D. Pa. Sept. 23, 2009). In *Hicks*, much like the present case, a police officer prevented the defendant from leaving by parking approximately ten feet away, ordered the defendant to lower his window, and then asked him to turn off his car. *Id.* at *1, 4.

An officer's request for a suspect to lower his or her window is not, in and of itself, a seizure. In *Johnson v. Campbell*, the suspect initially refused to comply with the order to roll down his window, but ultimately lowered his window a few inches after the police officer repeated the request multiple times and told him that he was being detained. 332 F.3d at 203. The Third Circuit held that the encounter became a stop not at the initial request to roll down the window, but seconds later when the police officer persisted in his request. *Id.* at 206; *see also United States v. Smith*, 575 F.3d 308, 314 (3d Cir. 2009) (characterizing the repeated requests by officers after an initial refusal to comply as a "defining feature [of *Johnson*] which turned the encounter into a seizure.").

Harrison argues that he was seized without reasonable suspicion at the outset of his interaction with police. (Def.'s First Suppl. Br. at 15.) He alleges that, due to the police officers' show of authority by blocking the street and gesturing for him to roll down his window, it was clear that he was not free to end the encounter. (*Id.* at 15–17.) The Government disputes both that the police car blocked traffic and that the officers instructed Harrison to lower his window. (Gov't Suppl. Opp'n to Mot. to Suppress [Gov't Suppl. Br.] at 8.) Instead, the Government argues that Harrison was not seized until he was ordered out of the car. (*Id.* at 14.)

Viewing the totality of the circumstances, the Court concludes that Harrison was seized when he complied with Officer Wright's repeated instruction to turn off his car. That Harrison could not have driven away because the one-way street was at least partially blocked by the

police car is relevant, but not sufficient in itself to constitute a seizure. *See United States v. Kim*, 25 F.3d 1426, 1431 (9th Cir. 1994) (noting that fact that police officer "partially blocked [defendant's] egress with his automobile informs but does not alter our conclusion"). The police did not box in Harrison's idling car, but rather parked towards the end of the road.[2] Thus, while the street may have been blocked, a reasonable person would not immediately perceive that he was unable to end the interaction.

Nor does the Court find that Harrison was seized when, according to him, he was asked to lower his window. Harrison does not allege that, as in *Johnson*, the two officers repeatedly commanded him to lower the window, 332 F.3d at 206, or told him he was being detained or were otherwise a threatening presence, *see Mendenhall*, 446 U.S. at 555.

Harrison was seized when he complied with Officer Wright's direction to turn off his car. Instead of taking the license and registration offered by Harrison, Officer Wright told Harrison to "turn the car off." (Tr. II at 11.) When Harrison hesitated and asked why he was being stopped, Officer Wright repeated his instruction "in a louder voice." (*Id.*) While this was happening, Officer Schmidt approached Harrison's door. In order to end the encounter, Harrison would have had to ignore Officer Wright's instruction and ask the officers to go back to their car and drive away. A reasonable person would not feel free to do so. *See Hicks*, 2009 WL 3150394, at *4.

**B.      The officers did not have reasonable suspicion to seize Harrison**

An investigatory stop is a seizure protected by the Fourth Amendment. *See United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014). In order to justify such a stop, a police officer must have "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). This suspicion must be based in an "objective justification" and not simply

---

[2] The Court need not resolve whether the police car was completely blocking traffic, as Officer Wright and Harrison testified, or not, as Officer Schmidt testified. The car's precise location is not material to the Court's determination.

"an unparticularized suspicion or hunch." *Brown*, 765 F.3d at 290 (internal quotations omitted). The Court considers the totality of the circumstances when evaluating whether reasonable suspicion existed to justify the stop. *Id.* The Court gives "considerable deference to police officers' determinations of reasonable suspicion," though it does "not owe them blind deference." *United States v. Alvin*, 701 F. App'x 151, 156 (3d Cir. 2017).

Before the officers ordered Harrison to turn off his car, they were required to have reasonable suspicion of criminal activity to justify the stop. The Government contends that the smell of marijuana, Harrison's furtive movement, and Hitchman's suspicious behavior supplied such reasonable suspicion. (Gov't Suppl. Br. 14.) The Court disbelieves the officers' testimony regarding the smell of marijuana and finds that the other factors did not create reasonable suspicion.

> i. *The Court disbelieves the officers' testimony regarding the smell of marijuana.*

"It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006). Like any other testimony, however, the Court must assess the credibility of testimony regarding the smell of marijuana. In evaluating a witness's credibility, the Court considers, among other factors, the witness's demeanor, ability to accurately recall events, and the extent to which the witness's testimony is supported by other evidence and testimony in the case. *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005). Ultimately, the Court also asks whether the testimony "withstands a common sense test of reason and logic." *Id.*

Here, both officers testified that they could smell marijuana from Harrison's car as soon as the windows were lowered. Harrison disputes that the smell was detectable. He testified that

the marijuana had only been in his car for less than half an hour and he used multiple air fresheners to mask any scent. And relevantly, the marijuana was all packaged.

Police recovered marijuana from three locations: Harrison's pocket contained four small plastic vials of marijuana, the center console of his car contained a closed plastic bag of 29 vials of marijuana, and the trunk contained one sandwich bag with loose marijuana and another with 30 plastic vials. In total, the officers recovered approximately 30 grams of fresh marijuana from the car. The officers did not recover any burnt marijuana.

Viewing the totality of the circumstances, the Court does not find it credible that the smell of fresh marijuana was immediately detectable by the officers once the windows were lowered. Several factors lead the Court to this conclusion: the inconsistency and embellishment of the officers' testimony; a previous adverse credibility finding against both officers in a similar case; and the unlikeliness of the officers' ability to smell the marijuana, given its packaging, weight, and location in the car.

First, the officers were inconsistent about several points significant to the Court's analysis. Although the officers both testified that they smelled marijuana from Harrison's car, they disagreed about where exactly their car was parked, where cash was found, and even whether Harrison lowered his driver's side window. Although Officer Schmidt testified that Harrison voluntarily lowered his window as he approached the car, Officer Wright testified that the driver's side "window was up" after his arrest. (Tr. at 72.) Though it appears a minor discrepancy at first blush, this inconsistency is meaningful because it implies that Officer Wright did not recall Officer Schmidt speaking with Harrison at all prior to ordering him out of the car. The officers were also inconsistent about what they communicated with one another prior to removing Harrison from the car and about Harrison's presence at the time that Officer Wright

found the gun under the driver's seat. While Officer Wright testified that Harrison's persistent stares at an area of the car prompted him to look into the floor of the driver's seat again, Officer Schmidt testified that Wright found the gun only after Harrison was secured in the police car down the block and Officer Schmidt had returned to Harrison's car. (Tr. 21–22; 73.)

The consistency of testimony regarding significant facts is an important tool for the Court to assess whether a witness is reliable. *See United States v. Thompson*, Crim. A. No. 15-222, 2015 WL 5159180, at *4 (E.D. Pa. Sept. 2, 2015). The Court recognizes that the officers testified in this case approximately eight months after Harrison's arrest and are involved in numerous arrests. However, the Court must still subject the testimony of officers to the same scrutiny as other witnesses. *See United States v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir. 1995) (viewing favorably use of jury charge instructing that testimony of law enforcement officer not necessarily entitled to any more, or any less, weight than any other witness). After all, seasoned police officers are well aware that the Court will rely on their detailed recollection of events in assessing the constitutionality of an arrest, and officers have the benefit of police records to aid them in recalling the specifics of each case.

Second, the officers appeared to exaggerate details to bolster their decision to stop and frisk Harrison. Officer Schmidt claimed that he could see Harrison's chest rising and falling due to his elevated heartrate and nervousness from outside the car, even though Harrison was wearing a t-shirt, thermal shirt, sweatshirt, and winter jacket. *See United States v. Cox*, Crim. A. No. 17-031, 2017 WL 2404914, at *7 (E.D. Pa. June 2, 2017) (finding that officer's testimony that he could see defendant's heartbeat through his t-shirt from outside a car "strains credulity"). The Court cannot credit this testimony. The fact that Officer Wright testified to seeing Harrison making a suspicious arm motion, but Officer Schmidt testified that he did not, also leads the

13

Court to believe that Wright exaggerated the suspiciousness of this motion. Officer Wright first testified that he was not focused on Harrison, since the passenger, Hitchman, was the person who had been initially crouching and, therefore, was the person he and Officer Schmidt were investigating. (Tr. at 68–69.) Despite his focus on Hitchman, Officer Wright then testified that, from his position standing outside of the passenger's door speaking with Hitchman, he noticed Harrison move his left arm, closest to the driver's side window. (*Id.* at 69–70; 83–84.) Yet Officer Schmidt, who testified that he was speaking with Harrison through the rolled down driver's side window, right next to where Harrison was allegedly making this suspicious motion, testified that he did not observe this. (*Id.* at 48.) While Harrison may very well have moved his arm, Officer Wright appears to have embellished the suspiciousness of Harrison's movement to strengthen his decision to signal for Officer Schmidt to remove Harrison from the car.

Third, a Philadelphia Court of Common Pleas judge found implausible testimony from Officers Schmidt and Wright as to the smell of fresh marijuana in a similar stop occurring only days after Harrison's arrest. In both cases, the officers justified the stop of a legally parked car by the smell of a strong odor of fresh marijuana. Despite the officers' testimony of the extremely strong smell of marijuana, the judge found the smell of the nearly 100 grams—more than three times the amount of marijuana recovered throughout Harrison's car—to be "barely detectable" and concluded that the Officers had not actually smelled any marijuana before stopping the defendant. Of course, the *Dill* case does not compel this Court's finding. A witness could testify credibly in one hearing even after being found not to be credible in another. Nonetheless, that adverse credibility determination adds to the Court's concerns about the reliability of the officers.

14

Moreover, the Court is particularly troubled by the similarity of the language used in each case. Just as he stated in this case, Officer Wright described a pungent odor of fresh marijuana "emitting" from Dill's car once he opened the door to the car. *Compare* Tr. 68 ("Once he rolled the window down I could smell the overwhelming smell of fresh marijuana like emitting from that vehicle just coming right at me.") *with* Def.'s Sec. Suppl. Br. Ex. A, Apr. 12, 2018 Tr. at 7, 11 ("Before I even got a chance to look over in the direction of the vehicle, I could smell a heavy odor of fresh marijuana emitting from that area. . . . Once that door is opened, it's full blast. You can smell the fresh marijuana. It hit you right in the face."). Notably, Officer Wright had already testified in *Dill* that the defendant's window was half open before he and Officer Schmidt stopped to investigate; that was precisely why they claimed they could smell the fresh marijuana as they drove down the block. But despite the window already being open, Officer Wright testified that opening Mr. Dill's car door made the odor suddenly "hit you right in the face." It troubles the Court that Officer Wright has a pattern of describing an overwhelming smell of fresh marijuana after opening suspects' cars, regardless of whether the car window was already down.

Finally, the location and packaging of the marijuana do not shore up the officers' testimony. As an initial matter, the Court finds it implausible that the marijuana in the trunk created an odor detectable by the officers. Harrison's car is a sedan with a passenger compartment separate from the trunk. (*See* Def.'s First Supp. Br. Ex. A.) The officers approached the car from the front and testified that the smell was suddenly noticeable once the car windows were lowered. They did not testify to any immediate scent of marijuana once they opened the trunk.

This leaves the marijuana in Harrison's pocket and the center console of the car. Harrison's pocket held four small plastic vials of marijuana. The center console contained a

15

plastic bag with 29 vials of marijuana. The bulk of the marijuana was packaged not only in vials, but also in a sealed plastic bag in a closed center console. Harrison also used multiple air fresheners to mask the scent.

Nor does the officers' conduct support their testimony regarding the smell of marijuana. Despite stating that they immediately could smell marijuana, the officers did not immediately act on their suspicion. Neither officer inquired about the smell or commented on it to one another. Nor did the officers testify to the smell becoming stronger as they were in closer proximity to the marijuana, either when Officer Schmidt was frisking Harrison or when Officer Wright, in reaching across the passenger compartment to remove the handgun, was directly beside the center console.

For the reasons described, the Court does not credit the officer's testimony regarding the smell of marijuana.

      *ii.     Harrison's behavior cannot independently justify the search and seizure.*

The Government asserts that Harrison's furtive movements and nervousness also justified his seizure and *Terry* patdown. However, these actions alone—even coupled with the officers' earlier observation of Hitchman crouching next to Harrison's car—did not give the officers reasonable suspicion to search or seize Harrison.

A suspect's furtive movements can contribute to an officer's reasonable suspicion that criminal activity is afoot. In *United States v. Moorefield*, the Third Circuit held that the defendant's repeated hand movements, including a shoving motion toward his waist, along with his refusal to obey the investigating officers' commands to keep his hands visible, constituted reasonable suspicion. 111 F.3d 10, 14 (3d Cir. 1997). *See also United States v. Calloway*, 571 F. App'x 131, 137 (3d Cir. 2014) (finding reasonable suspicion based in part on defendant

"repeatedly disobey[ing] an order to show his hands and officers observ[ing] him with his hands near his waist and his hands partially in the air"); *United States v. Broadus*, 291 F. App'x 486, 489 (3d Cir. 2008) (finding reasonable suspicion existed where, among other factors, defendant in car was "continually moving his left arm and hand to his left side . . . even though [the police officer] had asked him to keep his hands in view"). If the suspect complied with an officer's commands or made only a single furtive movement, the Third Circuit has generally required the furtive movement more clearly indicate that the suspect was concealing contraband or a weapon. *See, e.g.*, *United States v. Brown*, 765 F.3d 278, 284, 290 (3d Cir. 2014) (finding reasonable suspicion where the suspect "made a motion which appeared consistent with removing an object from his waistband and placing it beneath the driver's seat" and the officers saw a gun in that location before seizing the defendant); *United States v. Terry*, 518 F. App'x 125, 128 (3d Cir. 2013) (finding reasonable suspicion based on the defendant's "series of suspicious movements," including a "shoving motion toward his waistband," leading the detective to believe he was concealing a weapon there).

An individual's nervousness is also a pertinent factor in evaluating whether reasonable suspicion exists, but it is insufficient in itself to justify a *Terry* stop. *Broadus*, 291 F. App'x at 489. A court must be careful to differentiate mere nervousness from suspicious, furtive behavior or specific observations that lead an officer to believe that a suspect is engaging in criminal activity. After all, "it is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer." *Alvin*, 701 F. App'x at 155.

Both officers described Harrison as acting nervously. Officer Wright also described Harrison as moving his left arm in a suspicious manner, which prompted him to signal for

17

Harrison's removal from the car. As the Court already noted, however, the Court does not credit Officer Wright's characterization of this movement as particularly suspicious, given that Officer Schmidt testified that he did not observe Harrison make any furtive arm movements and the specific observations that Officer Wright testified to. The fact that Officer Wright later discovered a gun under Harrison's seat does not alter the Court's analysis. There was no testimony that Harrison was starting to lean over, made a shoving motion, or even had his hands hidden from view. All that Officer Wright observed was Harrison slowly moving his arm toward his thigh and towards the door while looking at the officer. The Court cannot rely on what Officer Wright later learned was hidden under the driver's seat to impute a more sinister meaning to Harrison's arm movement; instead, the Court must consider Officer Wright's specific observations only.

Indeed, the testimony provided about Harrison's arm motion distinguishes this case from others where the Third Circuit has held that a suspect's furtive movements created a reasonable suspicion that criminal activity was afoot. Unlike in *Moorefield*, neither officer ordered Harrison to keep his hands visible or not to move; rather, Officer Wright signaled for Officer Schmidt to remove Harrison immediately after he moved his arm. 111 F.3d at 14. And, as described above, Officer Wright did not testify to any specific movements, such as movement at the floor area of the car or a stuffing motion, that mirror those in cases like *Brown*. 765 F.3d at 284.

The Court is thus unwilling to find reasonable suspicion in Harrison's generally nervous demeanor and Officer Wright's observation of Harrison moving his left arm. Prior to being approached by police, Harrison was sitting in his legally parked car during the daytime, not exhibiting any suspicious behavior. Harrison's nervousness and single arm movement after being approached by two police officers in a high crime neighborhood did not give the police

reasonable suspicion that criminal activity was afoot. *See Alvin*, 701 F. App'x at 155 (rejecting the argument that nervousness or "even an isolated evasive act" rise to the level of reasonable suspicion).

### iii. *Hitchman's crouching did not create reasonable suspicion as to Harrison.*

The police initially approached Harrison's car because they saw Hitchman duck down beside it as they drove past. In *United States v. Alvin*, the Third Circuit held that an individual crouching down behind a car, "as if hiding" from an unmarked police car, did not in itself form reasonable suspicion to stop the defendant. 701 F. App'x 151, 152, 155 (3d Cir. 2017). The Court of Appeals recognized that "not every slouch, crouch, or other supposedly furtive movement justifies a stop," particularly in "'high-crime' areas, where residents may simply want to avoid encounters with police for reasons unrelated to any criminal conduct on their part." *Id.* at 155. As such, Hitchman's crouching down did not provide reasonable suspicion to stop the car. This is particularly so because, according to Officer Wright, Hitchman later spoke with police and acted "normal" and "very calm." (Tr. 32.)

Hitchman's initial furtive movement also had no bearing on Harrison. The police initially did not notice Harrison as they first drove down Simpson Street. When they approached Harrison's car to speak with Hitchman, his car was parked legally and Officer Schmidt conceded that Harrison "wasn't doing anything wrong at that point." (Tr. 31:1–2.) A quick observation of the area around Harrison's car did not reveal any contraband. The police were well within their right to follow up on their observation and approach Hitchman, but his behavior did not create reasonable suspicion of criminal activity, particularly with regard to Harrison.

In sum, the Court concludes that the officers lacked reasonable suspicion to stop Harrison. While the officers' testimony was supported by the later discovery of contraband and a

handgun under Harrison's seat, the Court must evaluate the facts known to police officers at the moment Harrison was seized. As of that point, the officers lacked a reasonable and articulable suspicion that criminal activity was afoot.

### b. Fruit of the Poisonous Tree

Given that the Court has determined that no reasonable suspicion existed to justify the seizure of Harrison, the physical evidence found on Harrison and inside of his car must be suppressed. *See United States v. Mosley*, 454 F.3d 249, 269 (3d Cir. 2006).

Several hours after his arrest, and while in custody, Harrison made an inculpatory statement and consented to the search of his cell phone, which uncovered text messages. (*See* Mot. to Suppress, at 4.) The statement and search of Harrison's cell phone flowed directly from his illegal seizure. Therefore, this evidence will also be suppressed as fruit of the poisonous tree.

## IV. CONCLUSION

Harrison was seized when the police officers, surrounding his car and blocking the street, ordered him to turn off the car. At that moment, police lacked the necessary reasonable suspicion to justify this seizure and subsequent patdown. Therefore, Harrison's motion to suppress all evidence obtained in connection to the March 11, 2017 search is granted. An appropriate Order will be docketed separately.